CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

SEP 30 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

OLIN WOOTEN,  )
    Plaintiff,  )  Civil Action No. 1:07cv00052
                          )
v.  )  **MEMORANDUM OPINION**
                          )
ROBERT C. LIGHTBURN,  )  By: GLEN M. WILLIAMS
    Defendant.  )  SENIOR UNITED STATES DISTRICT JUDGE

## I. Procedural History and Background

This case was initiated by the plaintiff, Olin Wooten, a Texas resident, against the defendant, Robert C. Lightburn, a Virginia resident, as the result of a dispute regarding the purchase of real property located in Washington County, Virginia. Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1332. In essence, Wooten brought this action against Lightburn claiming that Lightburn conveyed fewer acres than what was agreed to in the purchase agreement. Thus, Wooten sought relief under the theories of breach of contract, breach of warranty, specific performance and quasi-contract. Competing motions for summary judgment were filed by the parties and were referred, pursuant to 28 U.S.C. § 636(b)(1)(B), to the Honorable Pamela Meade Sargent, United States Magistrate Judge.

By orders entered March 6, 2008, and April 8, 2008, the undersigned accepted the Magistrate Judge's recommendations and granted Lightburn's motion for summary judgment as to the breach of contract and breach of warranty claims, leaving

-1-

only the equitable claims of specific performance and quasi-contract for the court's consideration. In allowing the specific performance and quasi-contract claims to survive summary judgment, the Magistrate Judge's Report and Recommendations, (Docket Item Nos. 49 and 62), which were accepted by this court, set forth the remaining disputed facts that were to be decided in consideration of each claim. With regards to the claim for specific performance of the agreement and an abatement of the purchase price, the court determined that there were disputes in fact as to whether abatement would be equitable and whether Wooten agreed to accept the risk of an acreage deficiency by not complying with the terms of the contract. As for the quasi-contract claim, the court found that disputes in fact existed as to whether Lightburn's acceptance and retention of the purchase price occurred under circumstances that rendered it inequitable for him to retain the benefit of the entire purchase price. Moreover, the court ruled that there were disputes in fact which would affect whether Wooten had a reasonable expectation of payment, whether Lightburn should reasonably have expected to reimburse Wooten due to the acreage shortage and whether society's reasonable expectations of security of person and property would be served if Lightburn was permitted to retain the entire purchase price.

Pursuant to Federal Rule of Civil Procedure 39(c), "[i]n an action not triable of right by a jury, the court . . . on its own . . . may try any issue with an advisory jury." Thus, although there is no right to a trial by jury for equitable claims, by order entered April 8, 2008, the undersigned determined that because material issues of fact were involved in this case, it was appropriate to allow an advisory jury to hear the disputed facts. On July 21 and 22, 2008, this case proceeded to trial on the two remaining claims of specific performance and quasi-contract. After two days of

-2-

argument and testimony, the court presented a special advisory verdict form to the advisory jury for its consideration. The advisory verdict form set forth precise questions for the advisory jury to answer and read as follows:

## I. COUNT III - SPECIFIC PERFORMANCE

**A.** **Has Wooten proven by a preponderance of the evidence that the property sold was sold by the acre or by estimation?**

YES _____ NO _____

**B.** **Has Wooten proven by a preponderance of the evidence that there was a deficiency in the quantity of land conveyed?**

YES _____ NO _____

**C.** **Has Wooten proven by a preponderance of the evidence that the quantity of land at issue was material in assessing the original purchase price?**

YES _____ NO _____

**D.** **Has Wooten proven by a preponderance of the evidence that, based upon the facts of this case, an abatement of the purchase price is equitable?**

YES _____ NO _____

*If your answer is YES to each of the above questions, then your verdict on the specific performance claim is for Wooten. If your answer is NO to **any** of the above questions, then your verdict on this claim is for Lightburn. Please go on to Section II.*

-3-

## II.  COUNT IV - QUASI-CONTRACT

**A.**     Has Wooten proven by a preponderance of the evidence that he conferred a benefit to Lightburn by paying him the entire purchase price?

YES _____     NO _____

**B.**     Has Wooten proven by a preponderance of the evidence that Lightburn knew that Wooten had conferred a benefit upon him by paying the entire purchase price?

YES _____     NO _____

**C.**     Has Wooten proven by a preponderance of the evidence that, under the circumstances, Lightburn's acceptance and retention of the entire purchase price occurred under circumstances that render it inequitable, or unfair, for him to retain it?

YES _____     NO _____

*If your answer is YES to each of the above questions, please go to the next question.  If your answer is NO to **any** of the above questions, then your verdict is for Lightburn on this claim. Please go to Section III.*

**D.**     Has Wooten proven by a preponderance of the evidence that he had a reasonable expectation that Lightburn would return some portion of the purchase price in order to account for any acreage deficiency?

YES _____     NO _____

**E.** Has Wooten proven by a preponderance of the evidence that Lightburn should have expected to return some portion of the purchase price in order to account for any acreage deficiency?

YES _____ NO _____

**F.** Has Wooten proven by a preponderance of the evidence that society's reasonable expectations of security of person and property would be defeated if Lightburn were to retain the entire purchase price without any repayment to Wooten?

YES _____ NO _____

*If your answers to questions D, E and F above are **all** NO, then your verdict on the claim for quasi-contract is for Lightburn. If **any** of your answers to questions D, E or F is YES, then your verdict on this claim is for Wooten. Please go to Section III.*

## III. DAMAGES AND INTEREST

*If you have found for Wooten on either claim, continue to the next question. If not, your deliberations are complete. Please sign and date this verdict form and return it to the courtroom.*

**A.** What amount of the original purchase price, if any, should Lightburn return to Wooten in order to do justice between the parties?

$_____

*Please go on to the next question.*

**B.** We find that Wooten is entitled to prejudgment interest on its damages to be calculated as of _____, 20____ [insert date].

-5-

The advisory jury answered each question affirmatively and found in favor of Wooten as to each count. Specifically, the advisory jury made a finding of damages in Wooten's favor totaling $390,244.75, plus interest to be calculated as of May 16, 2007.

According to Federal Rule of Civil Procedure 52(a)(1), "[i]n an action tried on the facts without a jury *or with an advisory jury*, the court must find the facts specially and state its conclusions of law separately." (emphasis added). Although the defendant has filed a traditional Rule 50(b) motion, which is applicable after a verdict has been entered, because this case was tried before an advisory jury, with the ultimate decision left to the undersigned, the defendant's arguments will be considered in the context of the court's determination of whether to adopt the advisory jury's findings. The court notes that in conforming with the requirements of Rule 52, the undersigned "need only make brief, definite, pertinent findings and conclusions upon the contested matters," as there is no need for "over-elaboration of detail or particularization of facts." *See* Notes of Advisory Committee on 1946 Amendments; *see also Torres-Lazarini v. United States*, 523 F.3d 69, 74 (1st Cir. 2008); *OCI Wyoming, L.P. v. PacifiCorp*, 479 F.3d 1199, 1204 (10th Cir. 2007); *Richardson v. Blanton*, 597 F.2d 1078, 1085 (6th Cir. 1979). Accordingly, I will set forth my findings and conclusions so as to specifically address the remaining relevant disputes in fact outlined in the Report and Recommendations, as well as those questions contained in the special advisory verdict form which were presented to the advisory jury.

-6-

## II. Findings of Fact

On July 24, 2006, Wooten entered into a contract with Lightburn to purchase approximately 1,977.13 acres of unimproved land located in Washington County, Virginia. According to the terms of the written contract, the purchase price was $4,250,000.00. Specifically, paragraph two of the contract provided:

> This price shall be adjusted to an exact Purchase price of <u>$2,150.00</u> Dollars per (acre). The exact area to be determined by a survey, to be made by a registered surveyor and paid for by <u>the "Purchaser."</u> At his option, Purchaser may waive said survey. The Purchaser shall pay to "Seller" at settlement the Purchase Price in cash or by cashier's or certified check.

The parties do not dispute that the contract called for a purchase price per acre. In particular, Wooten testified that he agreed to a price term of $2,150.00 per acre, noting that the essence of the deal was a sale by the acre to be determined by a survey. Furthermore, Wooten testified that he and Lightburn agreed to honor the "up and down nature" of paragraph two, which meant that the price would be adjusted to $2,150.00 per acre. At no point in the record or in his testimony did Lightburn dispute the notion that the land was to be sold by the acre. Thus, based upon the contractual language, as well as evidence presented at trial, it is clear that the parties agreed to a conveyance by the acre, thereby making the quantity of land material as to the assessment of the purchase price.

The contract also contained a study period provision, which allowed the purchaser to enter upon the property for the purposes of examination and study. At

trial, Wooten acknowledged that he wanted such a provision to be included in the contract. The study provision stated:

> Purchaser and his agents shall have 30 days from the date of execution of this Contract by both Purchaser and Seller to allow the Purchaser, at its expense and liability, to enter upon the property to determine, through engineering and feasibility studies, whether Purchaser's plan of development of the Property is practical and to give the Purchaser time to look over the property, have title examined, and the deeds reviewed by a registered surveyor to decide if a survey is necessary. Purchaser shall contract for such studies within 5 days from the date of execution, and deliver to Seller and Seller's agent copies of the letter(s) ordering the studies. If within said 30 days, Purchaser notifies both Seller or an agent of Seller, in writing via Certified Mail, that his plan, in his sole judgment, is not practical or there is a problem with the deed, title or survey, Purchaser may declare this Contract null and void. In this event, Purchaser shall receive a full refund of his $50,000.00 U.S. Dollar Deposit and all parties shall be relieved of further liability hereunder. In the absence of such timely notice (time shall be of the essence) from the Purchaser that he elects to declare this Contract null and void, this Contract shall be in full force and effect. Purchaser agrees not to make changes in the character or topography of the property during the course of the studies.

There is no definitive evidence that Wooten contracted for any studies within five days of the execution of the contract. However, at trial, Wooten testified that upon execution, he and his associates immediately began conducting their due diligence as to the land, including attempts to hire someone to survey the property. Tony Holbrook, a licensed surveyor, testified that he was first contacted in early October 2006 and that he completed a survey plat of the land in question in late November 2006 at the request of Wooten. Although Wooten testified that his associates contacted Holbrook regarding a survey close to the time the contract was signed,

-8-

there is no additional evidence to suggest that Holbrook was officially contacted prior to October 2006.

The contract provided that the settlement date was scheduled for September 25, 2006, in Abingdon, Virginia. However, pursuant to the contract, the purchaser was permitted to extend the settlement from September 25, 2006, to October 24, 2006, if the purchaser paid $100,000.00 to the seller by September 20, 2006. If the purchaser elected to extend the settlement date to October 24, 2006, he reserved the right to extend the settlement date one final time to November 20, 2006. In order to take advantage of this second extension, the purchaser was required to pay an additional $100,000.00 by October 18, 2006.

Not only did the contract allow for the settlement extension option, but it also contained an extension of the study period. This provision stated, "[i]f the Purchaser does not withdraw from the Contract within the first 30 days and the $50,000.00 Deposit becomes non-refundable and is subsequently delivered to the Seller, then the Purchaser may continue to study the property for an additional 12 weeks, ending on September 7, 2006[,] at 5:00 PM EST." If during this additional two week period the property was found to be objectionable, the purchaser reserved the right to "declare [the] Contract null and void by delivering written notice, via Certified Mail to the Seller or the Seller's agent on or before [September] 7, 2006." According to the terms of the agreement, if the contract was declared null and void, all parties were relieved of further liability. Additionally, the contract stated that "[i]n the absence of such timely notice (time shall be of the essence) from the Purchaser that he elects to declare this Contract null and void, this Contract shall be in full force and effect."

-9-

Lightburn maintains that September 7, 2006, was the date by which Wooten should have acted if he sought to address any acreage deficiency. There is nothing within the record to demonstrate that Wooten declared the contract null and void by September 7, 2006.

However, both parties acknowledge that the 1,977.13 acres, as noted in the contract, was based upon information contained in a survey completed by Gale Maiden several years prior to this agreement. Greg Greene, an associate of Wooten's who assisted with the acquisition of the property in question, testified that from the early stages of this deal he realized that there was an issue as to acreage, noting that there was a discrepancy in the total acreage reported by the county tax records and the acreage noted in the Gale Maiden survey. Greene testified that, due to this discrepancy, he knew that an additional survey would be required. Likewise, Wooten testified that, based upon his information, he also recognized that a survey would be needed to determine the actual amount of acreage. Lightburn himself even acknowledged that the Gail Maiden survey and the county tax records were at odds regarding the actual amount of acreage.

On September 19, 2006, Wooten elected to extend the settlement date from September 25, 2006, to October 24, 2006. As a result, an amendment to the contract was made and Wooten paid the required $100,000.00. Less than one month later, on October 16, 2006, another amendment to the contract was made. Wooten again elected to extend the settlement date, this time from October 24, 2006, to November 20, 2006. Wooten paid the required $100,000.00 non-refundable deposit. Notably, this amendment specifically stated that "TIME IS OF THE ESSENCE with respect

-10-

to the final November 20, 2006[,] settlement date and may not be extended without prior written agreement between both the Purchaser and the Seller." The parties agreed to a final amendment on November 16, 2006, which extended the settlement date from November 20, 2006, to November 30, 2006. This particular amendment plainly stated that "TIME IS OF THE ESSENCE with respect to the final November 30, 2006[,] Settlement Date. No further settlement date extensions are permitted, this transaction must settle on or before November 30, 2006[,] otherwise Purchaser will be in Default." In exchange for the extension, Wooten agreed to pay $50,000.00, which was to be applied to the purchase price if the transaction reached settlement. Further, Wooten agreed to pay Lightburn an additional $1,100.00 per day from November 21, 2006, until the final settlement date. While Lightburn contends that Wooten's need for the extensions was in large part due to the inability to gather resources to close the deal, the surrounding facts, including the communications between each parties' counsel, show that the need for a survey contributed to the extension requests.

It is clear that, prior to closing, a dispute arose regarding the actual acreage being conveyed in this transaction. Not only is there evidence that early in the course of dealings the parties recognized a problem with the acreage as stated in the Gail Maiden survey, but there is also ample evidence that in the days leading up to the closing, counsel for the parties thoroughly discussed the acreage issue and the possibility of a price adjustment. On November 28, 2006, Phillip Hearl, counsel for Wooten, contacted Timothy Kelsey, counsel for Lightburn, by e-mail and wrote, "[t]he only other issue that has arisen is a provision in the Contract that allows for an adjustment in the purchase price if the acreage is not 1,977." Hearl stated that a

survey would be completed in approximately one week and asked Kelsey to consider the idea of allowing paragraph two of the contract to survive closing, which would allow the parties to make any price adjustments after closing. Later that same day, Hearl informed Kelsey that he expected to have the acreage figure from the surveyor on November 29, 2006, which would allow them to address the acreage issue. Thus, at this point in the discussions between the parties, Wooten's counsel felt that the survey would allow the parties to address the acreage issue and that there would be no need for paragraph two to survive closing.

On November 29, 2006, Kelsey responded to Hearl's messages and noted that he needed to review the relevant language relating to the acreage adjustment. Kelsey explained, "[m]y client wants to take the position that the time has passed for such an adjustment and I'm just reviewing the contract and addenda to see if his argument will fly." Within this e-mail, Kelsey offered his opinion that the language contained in paragraph two was "pretty conclusive," but stated that he wanted to examine the issue closer. Kelsey asked that Hearl not record the deed "until [the parties had] something nailed down." In response, Hearl reiterated Wooten's position that the survey adjustment language remained applicable. Kelsey then requested that Hearl forward the property survey signed by a registered surveyor. Kelsey noted that the survey had to be conducted by a registered surveyor and referenced the November 16, 2006, amendment to the contract which stated that time was of the essence. In addition, Kelsey pointed out that paragraph three of the contract, i.e. the study period provision, provided for an ample study period, noting that "I do not think we would accept a survey to adjust the price after November 30, 2006." Thus, at this stage, the record shows that, despite the contractual language, Lightburn *was* open to accepting

-12-

a survey to adjust the purchase price. After receiving this message, Hearl informed Kelsey that he was awaiting a letter from the surveyor which measured the total acreage as 1,770.29 acres, resulting in an adjusted purchase price of $3,806,123.50 instead of $4,250,000.00.

Later that night Hearl sent an e-mail to Kelsey attaching a copy of a survey plat completed by registered surveyor Tony Holbrook. Contrary to his previous e-mail, Hearl indicated that the survey reflected a total acreage of 1,896.77 acres, which he said equated to a sales price of $4,078,055.50. In this particular e-mail, Hearl mentioned certain concerns that had been expressed by Lightburn as to the use of a deed compilation as opposed to a field survey in calculating the actual acreage amount. Despite these concerns, Hearl pointed out that the contract did not specifically require a field survey and reiterated his contention that the property in question did not total 1,977.13 as originally represented by Lightburn. Hearl also noted that Wooten was not opposed to leaving the acreage issue open for confirmation by a field survey and explained that the surveyor had informed him that a complete survey would take approximately six to eight weeks due to the size of the property. Furthermore, Hearl explained that if Lightburn would agree to keep the issue open, Wooten would pay an additional $2,150.00 per acre plus interest for any acreage over the 1,896.77 acres as revealed by the field survey. Hearl then requested three months to complete the field survey. Lightburn rejected the survey plat completed by Holbrook because it was not a field survey, even though nothing within the contract required that the survey be a field survey.

On November 30, 2006, the day of closing, Kelsey contacted Hearl by e-mail

and authorized Hearl to record the deed pursuant to an instruction letter dated November 28, 2006, "using the figures as stated in the Closing Statement included therewith." Kelsey stated that "[w]e are hereby tendering performance" on behalf of Lightburn and demanded payment in accordance with the terms of the Closing Statement. In response, Hearl wrote:

> [O]ur interpretations of the Purchase Contract are clearly at odds. We believe that the Contract provides for a reduction in the purchase price to $2,150.00 per acre multiplied by 1,896.77 acres shown on the survey provided to you by email this morning. Based on this, Mr. Wooten is ready, willing and able to close immediately based on available funds in my Trust Account at $4,078,055.50.

Hearl commented that he felt compelled to set forth this issue in order to protect Wooten's rights, but explained that Wooten agreed to pay the original purchase price "under protest." In explaining his client's position, Hearl stated:

> Again, this agreement to close based on the $4,250,000.00 purchase price is done under protest, and Mr. Wooten reserves all rights to pursue any and all claims available to him as a result of the acreage not being the represented 1,977. In this regard, Mr. Wooten objects to the provision in paragraph 2 of the Contract being merged into the Deed at closing.

Kelsey promptly responded and set forth the procedure with which Lightburn had agreed to proceed. Kelsey listed instructions regarding payment of the purchase price, method of payment and recording of the deed. In addition to these instructions, Kelsey acknowledged that Wooten "claim[ed] reservation of rights to paragraph 2 of the contract." In closing, Kelsey wrote, "I confirmed with my client that we can proceed according to the above."

-14-

Upon closing, Wooten's counsel paid the majority of the purchase from a trust account. Wooten paid the remaining portion of the purchase price by personal check to Lightburn on December 1, 2006. The personal check included a notation that read "for 1900+- escrow pending on field survey," which strongly suggested that Wooten was under the impression that the acreage issue would be addressed post-closing pending the completion of a field survey. Lightburn acknowledged that he cashed this check and that he received all required payments, making no objection to the obvious notation. Shortly after closing, in early December 2006, Wooten employed Addison Surveyors to complete a field survey, costing Wooten approximately $30,000.00. By letter dated May 16, 2007, Hearl presented the findings of the field survey to Lightburn, noting that Wooten agreed to proceed with the closing under protest and that he reserved the right to revisit the acreage issue upon the completion of a field survey. The field survey and plat demonstrated that there was indeed a deficiency in the acreage conveyed. Instead of the 1,977.13 acres noted in the contract, this particular survey showed that the property in question amounted to 1,879.273 acres, resulting in a purchase price reduction of $210,113.05. However, as Hearl testified, this amount was erroneously reported in the letter to Lightburn. The field survey by Addison Surveyors actually indicated that the acreage purchased totaled 1,795.235 acres. Thus, according to the field survey, as well as the concession of both parties, the actual acreage conveyed was less than the amount stated in the contract, thereby establishing that there was a deficiency in the acreage conveyed. Despite the receipt of this information, Lightburn refused to adjust the purchase price.

Based upon the extensive e-mail communications between counsel for each party, it is evident that the parties actively discussed the issue of acreage, as well as

-15-

the need for a survey. Although Lightburn contends that the contract provided for a certain date by which the survey should have been completed, it is obvious from the evidence before the court that his representatives entertained the possibility of accepting a survey for the purposes of adjusting the purchase price up until November 30, 2006, which was beyond the date for a study period as stated in the contract. That, coupled with the fact that the parties repeatedly discussed the possibility of allowing the acreage issue to survive closing, indicates that Wooten did not expressly agree to bear the risk of an acreage deficiency.

## III. Conclusions of Law

### A. Specific Performance Claim

In this case, Wooten claims that he is entitled to specific performance of the price per acre term in the contract and an abatement of the purchase price reflecting a reduction equal to the difference between the acreage amount as stated in the deed and the amount of acres actually conveyed. The Supreme Court of Virginia has consistently held that specific performance is not a remedy of right, explaining that, in order to invoke this "extraordinary equitable remedy," the plaintiff "must first prove a contract enforceable at law." *See Robertson v. Gilbert*, 249 S.E.2d 787, 789 (Va. 1978); *see also Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 493 (E.D. Va. 2002); *Fisher v. Bauer*, 436 S.E.2d 602, 604 (Va. 1993).

-16-

Virginia law recognizes an equitable right of abatement of the purchase price in situations where there is a deficiency in quantity when the property in question was sold by the acre or by "estimation," where the quantity was material in assessing the price. *See Green v. Taylor*, 10 F.Cas. 1120, 1123 (E.D. Va. 1879). This equitable remedy of abatement is generally enforced by a request for specific performance. *See Chesapeake Builders, Inc. v. Lee*, 492 S.E.2d 141, 145 (Va. 1997). Falling in line with other equitable remedies, the right to abatement of the purchase price should be imposed only when it is equitable to do so under the facts and circumstances of each particular case. *See Millman v. Swan*, 127 S.E. 166, 168-69 (Va. 1925). However, where the evidence shows that the parties expressly agreed that the purchaser should bear the risk of a deficiency, no equitable relief should be granted. *See Blessing's Adm'rs v. Beatty*, 40 Va. 287 (1842).

Here, there is no dispute that the parties entered into a contract regarding the sale of the property in question. Therefore, by all accounts, there is an enforceable contract at law. That said, in order for Wooten to show that he is entitled to specific performance of the price per acre term and receive an abatement of the purchase price, he must show that the land was sold by the acre or by estimation, that quantity was material in assessing the original purchase price and that there was a deficiency in the quantity of land conveyed. As noted in the findings of fact, these issues are not in dispute. All relevant evidence clearly indicates that the property was sold by the acre; thus, in turn, it is logical to conclude that because it was a sale by the acre, the quantity of land was certainly material in assessing the original purchase price.

Furthermore, the parties acknowledged that the 1,977.13 acres, as represented

in the original purchase agreement, was not an accurate acreage total. It should be noted that this amount was taken from the Gail Maiden survey, a survey that was determined to be incorrect. The Addison field survey, which was conducted subsequent to the closing, showed that the property in question amounted to merely 1,795.235 acres, a difference of 181.895 acres. At a price of $2,150.00 per acre, the purchase price would have been reduced significantly. Based upon the evidence presented, it is readily apparent that there was a deficiency in the quantity of land conveyed.

The remaining issue for the court's consideration with regards to this claim is whether it is equitable, based upon the facts presented, to allow Wooten to receive an abatement of the purchase price and whether Wooten expressly agreed to bear the risk of a deficiency. After consideration of the relevant facts, I am of the opinion that Wooten did not expressly agree to bear the risk of a possible deficiency. While the contract provided for a definite time to complete a survey, the record demonstrates that Lightburn's counsel was willing to accept a survey to address the acreage issue up until November 30, 2006, which was beyond the time frame stated in the contract. Hearl presented a survey plat completed by Holbrook Surveyors to Lightburn's counsel on November 29, 2006; however, although Wooten presented a survey plat prior to the apparent November 30 deadline, Lightburn refused to accept it because it was not a field survey. The undersigned notes that the contract itself is devoid of any provision that required the survey to be an actual field survey; instead, the contract simply called for a survey completed by a registered surveyor.

The evidence of record further demonstrates that the parties openly discussed

-18-

the possibility of allowing the acreage issue to survive closing. In the final discussions between the parties prior to closing, Wooten specifically stated that he would close "under protest," reserving the right to address the acreage issue post-closing. Lightburn's counsel acknowledged Wooten's contention and agreed to proceed. In particular, Lightburn's counsel precisely stated that Wooten "claim[ed] reservation of rights to paragraph 2 of the contract," and stated that "I [have] confirmed with my client that we can proceed according to the above." The court notes that in Kelsey's deposition, portions of which were read into the record at trial, Kelsey testified that by noting that Wooten "claims reservation of rights to paragraph 2 of the contract," he did not intend to imply that Lightburn was willing to allow the issue to survive closing. However, the remaining evidence suggests otherwise. Not only was Lightburn well aware of Wooten's position, but he failed to unequivocally reject that position in the final message. Additionally, on December 1, 2006, Wooten paid a portion of the purchase price by personal check, with a notation that stated "for 1900+- escrow pending on field survey," suggesting that he believed the acreage issue would be resolved post-closing, after completion of a field survey. Lightburn accepted this check and cashed it without any objection, indicating that he was well aware of this alleged agreement to resolve the acreage issue post-closing after the completion of a field survey. In addition, the record shows that Wooten hired Addison Surveyors, and paid them approximately $30,000.00 to complete a field survey just days after closing, which tends to show that he genuinely thought the acreage issue would be addressed post-closing.

Lastly, the court notes that there is no provision within the contract that explicitly prohibits the enforcement of the price per acre term due to failure to

-19-

conduct a survey. Instead, the failure to conduct a survey during the study period or the study period extension time frame simply prevented Wooten from declaring the contract null and void. Therefore, Wooten did not waive his right to adjust the purchase price due to the acreage deficiency, as that term remained in full force and effect.

Accordingly, based upon the evidence presented at trial, the undersigned is of the opinion that Wooten did not agree to bear the risk of deficiency; instead, he consistently sought to resolve the acreage issue, as evidenced by exercising his right to several extensions, which required the payment of valuable consideration, and the e-mail discussions between the parties' counsel. As such, under the circumstances, it would be inequitable to deny Wooten abatement of the purchase price. The court finds that the advisory jury was justified in finding in Wooten's favor as to the specific performance claim, as there is sufficient evidence within the record to support that finding. Therefore, the advisory jury's finding as to specific performance shall be formally adopted.

## B. Quasi-Contract Claim

Wooten also argues that, under the theory of quasi-contract, he is entitled to recovery because Lightburn was unjustly enriched as the result of a benefit conferred upon him by Wooten. In general, a quasi-contract arises from the equitable principle that one person may not enrich himself unjustly at the expense of another. *See Kern v. Freed Co., Inc.*, 299 S.E.2d 363, 365 (Va. 1983). In fact, a quasi-contract is actually not a contract at all; instead, it is "an equitable remedy thrust upon the

-20-

enrichment." *Nossen v. Hoy*, 750 F. Supp. 740, 744 (E.D. Va. 1990) (citing *Marine Dev. Corp. v. Rodak*, 300 S.E.2d 763, 766 (Va. 1983)); *see also Commonwealth Group-Winchester Partners, L.P. v. Winchester Warehousing, Inc.*, 2007 U.S. Dist. LEXIS 64652 (W.D. Va. Aug. 31, 2007); *Atl. Credit & Finance Special Finance Unit, LLC v. MBNA Am. Bank*, 2001 U.S. Dist. LEXIS 10957 (W.D. Va. June 4, 2001). In *Nossen*, the court explained that quasi-contract is a plaintiff's remedy at law when the facts and circumstances of the case demonstrate that a defendant has been "unjustly enriched at the expense of the plaintiff, but where the facts fail to establish that the parties established any form of agreement." 750 F. Supp. at 744. The court set forth three elements that must be shown by the plaintiff in order to properly establish a quasi-contract, including:

> (1) [a] benefit conferred on the defendant by the plaintiff; (2) [k]nowledge on the part of the defendant of the conferring of the benefit; and (3) [a]cceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value.

*Nossen*, 750 F. Supp. at 744-45 (citing *Corbin on Contracts*, § 19 at 50).

As noted in *Nossen*, "the modern trend is to recognize actions for quasi-contract based on 'a reasonable expecation theory.'" *Nossen*, 750 F. Supp. at 745. Under the reasonable expectation theory, in order to successfully recover based on quasi-contract, one of three things must be true: "(1) [t]he plaintiff had a reasonable expectation of payment; (2) [t]he defendant should reasonably have expected to pay; or (3) society's reasonable expectations of security of person and property would be defeated by nonpayment." *Nossen*, 750 F. Supp. at 745 (citing *Provident Life &*

*Accident Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir. 1990); *Corbin on Contracts*, § 19A at 59).

This claim specifically pertains to the alleged agreement that the parties would allow paragraph two of the contract to survive closing, so that Wooten could then revisit any acreage deficiency and possibly receive a refund for any overpayment. In examining the merits of this claim, it is clear that Wooten conferred a benefit to Lightburn by paying him the entire purchase price of $4,250,000.00 at closing. Likewise, it is equally clear that Lightburn was aware that Wooten had conferred a benefit upon him, as Lightburn received the full purchase price. There is no dispute between the parties as to these issues.

Therefore, the court must next determine whether Lightburn's acceptance and retention of the entire purchase price occurred under circumstances that render it inequitable, or unfair, for him to retain it. In this case, it appears that Lightburn's acceptance and retention of the full purchase price did indeed occur under inequitable circumstances. First, it is obvious that Lightburn received payment for more acres than he actually conveyed. In fact, Wooten paid for an additional 181.895 acres. Second, the evidence also demonstrated that Wooten repeatedly attempted to resolve this issue prior to closing. Lightburn's counsel, despite his contention that the contract provided for the exclusive time in which to conduct a survey, explicitly stated that they would accept a survey up until November 30, 2006, to address the acreage issue raised by Wooten. However, when Wooten provided a survey plat prior on November 29, 2006, Lightburn inexplicably rejected it because it was not a field survey. Thus, based upon the facts presented, it appears that Lightburn's counsel led

-22-

Wooten to believe that the acreage issue could be addressed prior to closing. Third, it is worth noting that both Wooten and Lightburn acknowledged that there were problems with the Gail Maiden survey, which stated that the land totaled 1,977.13 acres. The discussions that followed indicated that Wooten maintained his belief that he would be permitted to reserve his right to revisit the acreage issue. Moreover, the final e-mail communication suggested that Lightburn's counsel agreed to proceed with full knowledge that Wooten claimed reservation of rights to address the price adjustment after closing. There is nothing within these final communications between the parties to suggest that Lightburn specifically rejected Wooten's claim of reservation of rights or an agreement to address the issue post-closing. That said, the court concludes that Lightburn's acceptance and retention of the full purchase price occurred under inequitable circumstances.

In determining whether the plaintiff is entitled to relief under a theory of quasi-contract, as noted above, the modern trend requires the plaintiff to also show either that Wooten had a reasonable expectation that Lightburn would return a portion of the purchase price to account for any acreage deficiency, that Lightburn should have expected to return a portion of the purchase price to account for the deficiency *or* that society's reasonable expectations of security of person and property would be defeated if Lightburn were to retain the entire purchase price without any repayment to Wooten. *See Nossen*, 750 F. Supp. at 745. For the same reasons set forth in the preceding paragraph, the court finds that *any* of these elements can be answered affirmatively. It is only reasonable to assume that Wooten expected to have the purchase price adjusted considering the parties agreed to a price per acre sale. Wooten paid for 1,977.13 acres, yet he only received 1,795.235 acres. Further,

-23-

Lightburn should have expected to return the overpaid amount, especially considering that he too was aware of the potential problems with the original Gail Maiden survey. Additionally, Lightburn's counsel was well aware of Wooten's repeated attempts to resolve the acreage issue and even acknowledged Wooten's reservation of rights claim, followed by an indication that Lightburn agreed to proceed according to the terms noted in the e-mail. Again, the facts show that despite Lightburn's conention that the time had passed to have a survey completed, Lightburn's representatives were willing to accept a survey to adjust the purchase price up until November 30, 2006. Lastly, in the interests of protecting society's reasonable expectations of security of person and property, the court finds that it would be inequitable to allow Lightburn to retain the entire purchase price when the facts suggest that Wooten was under the impression that the acreage issue would be resolved post-closing, pending a proper field survey.

Thus, after a review of the evidence presented at trial, the undersigned finds that the advisory jury's finding as to Wooten's quasi-contract claim is justified, as it is supported by sufficient evidence of record. As such, the court formally adopts the advisory jury's finding as to quasi-contract.

C. *Damages & Interest*

The advisory jury calculated damages totaling $390,244.75, plus interest from May 16, 2007, the date Wooten presented the Addison field survey to Lightburn's counsel. The court is satisfied with the advisory jury's calculation of damages and interest. Furthermore, the court orders that the prejudgment interest shall be

-24-

calculated from May 16, 2007, until the date of this judgment, at the annual rate of six percent, pursuant to Virginia Code § 6.1-330.54 (2008), and post-judgment interest shall be calculated from the date of this judgment at a rate of 1.97 percent, pursuant to 28 U.S.C. § 1961.

## IV. Conclusion

The court notes that it is in total agreement with the conclusions of the advisory jury. For the reasons stated above, the court formally adopts the findings of the advisory jury and denies the defendant's post-trial motion.

An appropriate order will be entered.

**DATED:**    This 30th day of September 2008.

/s/ Glen M. Williams

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-25-